

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 24, 2015

**BY ECF AND HAND DELIVERY**

Honorable Kenneth M. Karas
United States District Judge
United States Courthouse
300 Quarropas Street
White Plains, New York 10601

       Re:    **United States v. Daniel Halloran,**
             **13 Cr. 297 (KMK)**

Dear Judge Karas:

The Government respectfully submits this letter in advance of the sentencing of defendant Daniel Halloran, which is scheduled for March 4, 2015, at 2:00 p.m. Halloran was found guilty of conspiracy, two counts of fraud, and two counts of Travel Act bribery, following a two-month jury trial. The United States Probation Office has determined that Halloran's sentencing range under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") is 78 to 97 months' imprisonment. For the reasons that follow, the Government respectfully disagrees with that calculation and recommends that the Court find the applicable Guidelines range to be 151 to 188 months.

The Government further recommends that the Court impose a sentence within the Guidelines range of 151 to 188 months' imprisonment. Halloran, then a member of the New York City Council, abused his position of public trust to enrich himself through quid pro quo bribery, receiving personal payments in exchange for the allocation of City funds. Even more brazenly, Halloran "quarterbacked" a bribery scheme that implicated the leaders of the Republican Party in three of New York City's boroughs and deprived members of the party of the honest services of their leaders. Halloran's offense conduct was truly egregious, equaled only by his perjurious testimony at trial. Based on the extent of Halloran's misconduct—both the charged offenses and his false testimony at trial—a Guidelines sentence is necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence generally to criminal conduct. *See* 18 U.S.C. § 3553(a)(1), (2)(A), and (B).

## BACKGROUND

### A.    The Offense Conduct

Halloran's criminal conduct involved two related bribery schemes, one pertaining to bribing party officials in connection with the 2013 mayoral race and the other arising from Halloran's ability to allocate City Council discretionary funds.

### 1.    The Scheme to Bribe New York City Republican Party Leaders

Between the fall of 2012 and the spring of 2013, Malcolm A. Smith, a Democratic member of the New York State Senate, former acting Lieutenant Governor, and former Majority Leader of the New York State Senate, was considering whether to run for mayor of New York City as a Republican.  From in or about November 2012 through in or about April 2013, Smith agreed with New York City Councilman Daniel J. Halloran, an undercover FBI agent posing as a wealthy real estate developer (the "UC"), and a cooperating witness ("CW") to bribe New York City Republican Party county leaders.  The bribe payments were in exchange for the Republican leaders' authorization for Smith to appear on the 2013 New York City mayoral ballot as a Republican candidate, even though Smith was a registered Democrat. Because Smith was not a registered Republican, under New York state law, he needed the approval of three of the five New York City Republican county executive committees in a form known as a "Wilson Pakula certificate" in order to appear on the ballot's Republican Party line.

In furtherance of the scheme, Halloran negotiated cash bribes to be paid by the UC and the CW to Vincent Tabone, the Vice Chairman of the Queens County Republican Party, Joseph J. Savino, the Chairman of the Bronx County Republican Party, and the chairman of a third Republican county committee. Halloran also arranged for the UC and the CW to meet Tabone, Savino, and two other Republican county committee chairmen to discuss the possibility of obtaining a Wilson Pakula certificate for Smith and what the chairmen would want in exchange for their approval of Smith to run for mayor as a Republican.

On February 8, 2013, Halloran met at a Manhattan hotel with the UC and CW. During that meeting, Halloran gave the following instructions to the CW and the UC: "So, look, you gotta, you gotta get [Savino] business but put twenty-five in an envelope. . . . [Tabone] is twenty-five up front, twenty-five when the Wilson Pakula is delivered. So, he wants, and he doesn't care about [the Queens County Republican Party] getting anything at this point." On February 10, 2013, the UC and CW met Smith at a hotel in Manhattan. During that meeting, the UC and CW told Smith about their conversation with Halloran and the three discussed how to ensure that Tabone and Savino would follow through on their promise to obtain a Wilson Pakula certificate for Smith after they had been paid. During that conversation, Smith discussed structuring the payments so that only a portion of the bribe would be paid initially, with the remainder to be paid after Smith received the Wilson Pakula certificate. Smith cautioned: "I wouldn't give them more than like ten, just to, just to start out. . . ." Toward the end of the meeting, Halloran joined Smith, the UC and the CW. During that portion of the meeting, Smith said to Halloran, "You've been busy," and Halloran responded that it had been "a heavy lift."

Halloran arranged for the UC and CW to meet with Tabone and Savino at a restaurant in Manhattan on February 14, 2013. In exchange, Halloran solicited and received from the UC and the CW approximately $20,500 in cash for himself. At the restaurant, Tabone and the UC discussed how much it would cost for Tabone to support obtaining a Wilson Pakula certificate for Smith. During that conversation, Tabone gave a "commitment" to "work to get . . . three or four" Republican county chairmen to sign a Wilson Pakula certificate for Smith. In exchange, the UC suggested a payment to Tabone of "twenty now, twenty later" and Tabone responded, "I was thinking twenty-five now, twenty-five later." Tabone also told the UC that he would send the UC a retainer agreement for the money. Following this conversation, Tabone and the UC retired to the UC's car where the UC handed Tabone an envelope containing $25,000 in cash.  While Tabone was in the car, Halloran and the CW remained in the restaurant and discussed the evening's events.  During that conversation, the CW said "We just, we just bought a republican candidate.  If you think about it." And Halloran replied "It's scary."

The UC and CW also met with Savino at the Manhattan restaurant. During that meeting, Savino agreed to obtain a Wilson Pakula certificate for Smith in exchange for a total payment of $30,000. Like Tabone, Savino got into the UC's car, where he accepted $15,000 in cash and agreed to accept another $15,000 after he formally approved Smith's appearance on the 2013 Republican ballot for New York City Mayor.

In exchange for the bribe payments to Tabone and Savino by the UC and CW, Smith, in his capacity as a New York State Senator, agreed to help obtain $500,000 in New York State funds for road work that would benefit a real estate project in Spring Valley that Smith understood was being developed by the UC's company.

In total, Halloran negotiated $110,000 in bribes to be paid to three New York City Republican party leaders in exchange for a Wilson Pakula certificate for Smith and a $75,000 payment to himself for his services in negotiating those bribes.

### 2.    The City Council Discretionary Funding Scheme

Between August 2012 and April 2013, Halloran accepted more than $15,800 in cash bribes from the UC and the CW in exchange for agreeing to steer up to $80,000 in New York City Council discretionary funding to a consulting company he believed was controlled by the UC and the CW (the "Company"). In particular, in exchange for the cash provided by the UC and CW, Halloran suggested that he give discretionary money from the City Council to the UC and the CW by granting them a contract to perform consulting work on a senior center in Queens (the "Senior Center Project"). The UC told Halloran that he did not want to do any actual work and was seeking "basically a no show" job. Halloran responded that the Senior Center Project could provide what the UC wanted.

In furtherance of this scheme, Halloran wrote two letters on New York City Council letterhead, one to civic organizations and the other to the Company. Despite suggesting in these letters that work would be done by the Company to support the allotment of up to $80,000 in discretionary funding for the Senior Center Project, Halloran agreed with the UC and the CW that the Company would either provide no services or could hire a subcontractor to provide services and then bill the City for an inflated amount.

As part of this arrangement, Halloran demanded that the UC and CW return a portion of the discretionary funds back to him in the form of a cash payment. On November 16, 2012, the UC met Halloran at a restaurant in Queens, New York, and provided Halloran with $10,000 cash in an envelope. At that same meeting, Halloran agreed to assist Smith in his quest to obtain a Wilson Pakula certificate from the New York City Republican Party. Two months later, Halloran met a second undercover FBI agent at a coffee shop in Manhattan and accepted $5,000 in cash in a Federal Express envelope.

**B.      The Indictment, Trial, and Guilty Verdict**

On April 18, 2013, a grand jury returned Indictment 13 Cr. 297 (KMK), charging Halloran in five counts. Count One charged Halloran with conspiracy, in violation of Title 18, United States Code, Section 371, to commit honest services wire fraud and to violate the Travel Act in connection with the scheme to bribe leaders of the New York City Republican Party county committees. Count Two charged Halloran with substantive honest services wire fraud and attempting to commit honest services wire fraud in connection with that bribery scheme, in violation of Title 18, United States Code, Sections 1343, 1346, 1349, and 2. Count Three charged Halloran with a substantive violation of the Travel Act in connection with that bribery scheme, in violation of Title 18, United States Code, Sections 1952 and 2 and New York Penal Law Sections 200.45 and 200.50. Counts Five and Six charged Halloran with wire fraud and a violation of the Travel Act, arising from his acceptance of bribes in exchange for City Council discretionary funds.[1]

On July 29, 2014, following a two-month jury trial, Halloran was found guilty of all counts charged against him in the Indictment.

**C.      The Presentence Report**

The Probation Office calculates the Guidelines range for Halloran as follows: Counts One, Two, and Three are grouped to form "Group 1" and Counts Five and Six are grouped to form "Group 2." (PSR ¶¶ 38-39). For Group 1, the base offense level is 14, which is increased by 4 levels based on a loss amount of $20,500, and by another 4 levels based on Halloran's status as an elected official, resulting in an adjusted offense level of 22. (PSR ¶¶ 40-46). For Group 2, the base offense level is 14, which is increased by 8 levels based on a loss amount of $80,000, and by another 4 levels based on Halloran's status as an elected official, resulting in an adjusted offense level of 26. (PSR ¶¶ 47-53). After performing the grouping adjustment, the Probation Office calculated the total offense level to be 28. (PSR ¶¶ 55-60). Because Halloran is in Criminal History Category I, the resulting Guidelines range is 79 to 97 months' imprisonment. (PSR ¶ 102).

---

[1] Counts Four and Seven through Ten of the Indictment pertained to Halloran's co-defendants.

## DISCUSSION

### A.      Applicable Law

Although no longer mandatory, the Sentencing Guidelines continue to provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005).  Under Supreme Court precedent, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," and that range "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  As the Second Circuit has remarked en banc, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice."  *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (internal quotation marks omitted).  The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349.

After making the initial Guidelines calculation, a sentencing judge must then consider seven factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in Section 3553(a)(2).  To the extent a District Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 188 (quoting *Gall*, 552 U.S. at 50).

### B.      The Probation Office Has Miscalculated the Applicable Guidelines Range

The parties agree that the offenses in all five counts should be grouped together, rather than divided into two groups, as recommended by the Probation Office.  (Def. Mem. 2).[2] Separate groups is not warranted here because "the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm" and the applicable Guideline for each of the counts, 3C1.1, is specifically listed as "to be grouped."   U.S.S.G. § 3D1.2(d).  Accordingly, there should be a single group for all of the counts of conviction and there should be no multiple count adjustment.

In addition, the Probation Office—and Halloran—have understated the applicable loss amount.  The applicable loss is "the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official *or others acting with a public official*, or the loss to the government from the offense, whichever is greatest."  U.S.S.G. § 2C1.1(b)(2) (emphasis added).  Here, the greatest reasonably calculable loss is the total amount of the bribes to be paid to acquire a Wilson Pakula certificate for Malcolm Smith (Counts One through Three), which is $185,000, plus the benefit that the

---

[2] "Def. Mem." refers to Halloran's sentencing memorandum filed on January 7, 2014.

undercover agent was to receive from the City Council Bribery Scheme (Counts Five and Six), which is $80,000, yielding a total loss of $265,000.

The Government arrives as the $185,000 loss figure for the Wilson Pakula Bribery Scheme by summing the: (a) $50,000 bribe to Vincent Tabone; (b) $30,000 bribe to Joseph Savino; (c) $30,000 intended bribe to Daniel Isaacs; and (d) the $75,000 payment demanded by the defendant in negotiating and arranging the aforementioned bribes.[3]  Accordingly, pursuant to U.S.S.G. § 2B1.1(b)(1)(G), 12 levels should be added under U.S.S.G. §  2C1.1(b)(2) to the base offense level of 14.

The parties further agree that two additional levels should be added, pursuant to U.S.S.G. §  2C1.1(b)(1), because "the offense involved more than one bribe or extortion."  (Def. Mem. 2).

Finally, as the Court witnessed firsthand during the trial, an additional two-level enhancement for obstruction of justice is warranted.

Based on the foregoing calculations, and taking into account the undisputed 4-level enhancement arising from Halloran's status as an elected official (Def. Mem. 3), his total offense level is 34, calculated as follows:

| U.S.S.G Section | Levels |
|---|---|
| 2C1.1(a)(1) | 14 |
| 2C1.1(b)(1) | 2 |
| 2C1.1(b)(2); 2B1.1(b)(1)(G) | 12 |
| 2C1.1(b)(3) | 4 |
| 3C1.1 | 2 |
| **TOTAL:** | **34** |

Offense level 34 joined with Criminal History Category I yields an advisory range of 151 to 188 months' imprisonment under the Guidelines.

Halloran's attempt to minimize the loss amount is unavailing.  Halloran baldly asserts that, with respect to the party leader bribery scheme, he should be held accountable only for the $20,500 that he actually received and not the $75,000 that he demanded.  (Def. Mem. 2).  The only explanation that he provides for his calculation is that the remaining $164,500 was "either not reasonably certain to be paid and/or [was] properly attributed to other people, namely the recipients Savino, Tabone and Isaacs."  Halloran's objection, however, has no basis in law. Under Section 2C1.1 of the Guidelines, the loss amount includes "the value of anything obtained or to be obtained by a public official or others acting with a public official . . . ."  U.S.S.G. § 2C1.1(b)(2). "'Loss', for purposes of [section 2C1.1], shall be determined in accordance with Application Note 3 of the Commentary to §2B1.1."  U.S.S.G. 2C1.1, Application Note 3.  Loss

---

[3] Messrs. Tabone and Savino received $25,000 and $15,000 respectively, but the evidence established that they anticipated that they would receive an equivalent payment once the promised Wilson Pakula certificate was delivered, yielding bribes of $50,000 and $30,000 respectively.

includes "the greater of actual or intended loss." U.S.S.G. 2B1.1, Application Note 3. "'Intended loss' (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible *or unlikely to occur* (e.g. as in a government sting operation . . . .)." *Id*. (emphasis added). In addition, loss includes "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id*. Accordingly, the loss amount includes not just what Halloran obtained, but what he reasonably could have foreseen his coconspirators obtaining, whether or not those payments were "reasonably certain to be paid." (Def. Mem. 2).

Notably, Halloran does not dispute that he reasonably could foresee a loss in the amount of $185,000 as a result of the mayoral bribery scheme, nor could he. Halloran negotiated that very amount in bribes to himself and others. Accordingly, with respect to Counts One through Three, the loss amount under U.S.S.G. § 2C1.1(b)(2) is $185,000.

Halloran's attempt to cabin his sentencing exposure with respect to the City Council Discretionary Scheme is similarly unavailing. Halloran asserts that he should be held responsible only for a $30,000 loss amount in connection with those charges because he never intended to deliver on his promise to provide $80,000 in city council discretionary funding. (October 28, 2014 Letter from Vinoo Varghese to Katrina Minus-Sheppard ("PSR Obj. Letter") at 3). The jury, however, convicted Halloran of deceiving the City out of the $80,000 in discretionary funding. While he may wish to cling to his story about deceiving the CW and UC rather than the taxpayers who elected him, that contention was rejected, beyond a reasonable doubt, and the Court should not countenance it. Accordingly, the loss amount for Counts Five and Six is $80,000, yielding a total loss amount of $265,000.

Finally, the Court should reject Halloran's objection to an obstruction of justice enhancement. The Court is quite familiar with the extraordinary nature of Halloran's testimony during the trial. For example, Halloran tried to explain his reference to "under the table" on the recorded conversations as "meaning they hired all of these political operatives" and, in the future, "all of this sub rosa information becomes supra rosa or above the line, and everyone knows what's going on." (Tr. 3154). He tried to explain his receipt of illicit cash contributes to his campaign as "loans," "gifts," and "income" as it suited his attempt to characterize his false financial disclosures and tax forms. And he repeatedly flouted the Court's instructions, trying to insert information regarding his brain tumor and hearsay statements about the Bloomberg campaign that have no basis in fact and were ruled inadmissible by this Court. Halloran's performance at trial on a single day would have merited an obstruction enhancement, but it is particularly appropriate here where Halloran continued to lie to the jury for over five days. Under these circumstances, the concept that "the defendant's specific statements... were true, or were not intentionally false, or were not material" is as fanciful as Halloran's testimony itself. (Def. Mem. 3 (quoting *United States v. Smith*, 62 F.3d 641, 646-47 (4th Cir. 1995))).

## C.    A Sentence within the Guidelines Range Is Appropriate

A sentence within the advisory Guidelines range of 151 to 188 months' imprisonment is reasonable and appropriate in this case principally due to the nature and circumstances of the offense, the need to promote respect for the law, and the need for adequate deterrence to criminal conduct.

Starting with "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), Halloran played a key role in an elaborate scheme to pay bribe payments to several New York City Republican leaders in order to obtain a benefit for a sitting New York State Senator and to line his own pockets. As set forth above, Halloran coordinated the bribery scheme, negotiated the bribes, and repeatedly demanded cash payments for himself, thereby undermining the integrity of an election.  In addition, he abused his position of trust with the City and its taxpayers by funneling tens of thousands of dollars to two people he barely knew under the pretense of having them assist in a project they had no connection to, all in exchange for tens of thousands of dollars in cash for himself.  And Halloran's conduct was brazen.  From the outset of the Government's investigation into him, Halloran made clear that, for him, use of the privileges afforded to him by his constituents was never "a question of whether or will but how much."  Halloran's offense conduct undermined the integrity of both the City and State government. Such offenses strike at the core of our system of government.  Damage which was only compounded by Halloran's week-long perjurious attempt to explain away his conduct as somehow legitimate.  Halloran made not only a mockery of the New York City legislature and electoral system but the system of justice that is holding him accountable for his crimes.

The need for the sentence to "reflect the seriousness of the offense, to promote respect for the law," and "to afford adequate deterrence to criminal conduct" also all weigh in favor of a Guidelines sentence.  18 U.S.C. § 3553(a)(2).  Ironically, Halloran asserts that his dedication to his constituents merits leniency in this case.  While he cites his good acts as a politician and a member of the bar, indeed a member of the law enforcement community, he fails to acknowledge the special position of trust those offices put him in, the knowledge they afforded him of the harm he could cause to others by violating that trust, and the damage that he indeed did through his crimes.  Yes, he has done good deeds in his political life, but he was supposed to do that.  What he was not supposed to do was use the privilege of his office, and the cloak of those good deeds, to secretly enrich himself at the expense of the community he purported to serve.  And no one more than a member of law enforcement, an Eagle Scout, and an elected official could know better that truth.

But rather than accept responsibility for his crime, Halloran persists in the argument that there is something novel and unique about this prosecution.  Nothing could be further from the truth.  Halloran engaged in crimes as old as time: he stole money from others to enrich himself and bribed others to get something for which he was not entitled.  That such behavior may be "business as usual" in Albany (Def. Mem. 13) is only more reason why the Court should send a strong message and sentence Halloran within the applicable Guidelines range.

Halloran's repeated and deliberate use of deception—up to and including during the trial—combined with his participation in multiple bribery schemes, and his abuse of his position as an elected official, demonstrate that a Guidelines sentence is appropriate to promote respect for the law and provide adequate deterrence.

8

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should impose a sentence on the defendant that is within the Guidelines range of 151 to 188 months' imprisonment.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____

Douglas B. Bloom
Justin Anderson
Assistant United States Attorneys

cc:     Jonathan Edelstein, Esq. (by ECF)